IN THE U.S. DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | CASE NO.:  4:24cr70 |
| | ) | |
| ASIA TAMARA BILLUPS, | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENSE POSITION WITH RESPECT TO SENTENCING FACTORS

COMES NOW the Defendant, Asia Tamara Billups, by undersigned counsel, Robert W. Canoy and in accordance with § 6A1.2 of the Sentencing Guidelines, policy statements, and this Court's Orders, the Defense hereby represents that it has received and reviewed the Presentence Investigation Report and Addendum thereto prepared by the United States Probation Officer. There are no unresolved Defense objections to the Presentence Investigation Report.

## APPLICATION OF THE 18 U.S.C. § 3553 SENTENCING FACTORS SUPPORT A DOWNWARD VARIANCE FROM THE SUGGESTED SENTENCE

Pursuant to the provisions of § 5K2.0(b) of the Federal Sentencing Guidelines Manual, and the factors to be considered in imposing a sentence as set forth in 18 U.S.C. §3553 (b) (2) (A)(ii), the Defendant, Asia Billups, by counsel, respectfully submits her request that this Honorable Court grant a downward variance from the applicable sentencing guidelines in order to impose a sentence which is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(l ) and (2).  Counsel submits that the appropriate sentence in this matter is always: for Count Nine: a period of imprisonment for one hundred eighty (180) months, followed by five years of supervised release; for Count Thirteen:  a period of imprisonment for one hundred eighty (180) months, followed by five years of supervised release; and for Count Fourteen: a

period of imprisonment for 5 years (60 months), followed by five years of supervised release. Counsel submits and requests that these prison terms run concurrently.

While the Court must consider the Guidelines as part of the sentencing process, the Guidelines merely "serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States,* 552 U S. 85, 90 (2007). Rather than simply imposing a sentence within the advisory Guidelines range, the Court must consider the whole range of factors listed in 18 U.S.C. § 3553 and determine a sentence that is "sufficient, but not greater than necessary." *Id*. at 101 (quoting 18 U.S.C. § 3553).

The Supreme Court has stated that trial courts may not even "presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 50 (2007). The sentencing court also has wide latitude to impose a sentence below the Guidelines range, "perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States,* 551 U.S. 338, 351 (2007).  Here, the § 3553(a) factors support a sentence well below the suggested Guidelines Range.

## DEFENDANT'S HISTORY AND CHARACTERISTICS:

Early in the morning on March 16, 2024, as an 18-year-old high school student in her Spring semester, Ms. Asia Billups did not know that her life was about to change forever. That morning, Asia awoke to her younger siblings moving about their family home. Strangely, Asia's father Isaac had not emerged from the master bedroom.

2

As Asia stood outside the master bedroom, odd noises audibly emerged from inside the master bedroom. Asia's mother Felicia Billups had left for work a few hours earlier, as she normally did, routinely leaving the house before 6:00 A.M. It was unusual that Asia's father Isaac was not awake because Asia's younger siblings were already awake.

The Billups household had established rules. One rule forbid the children's entry into their parent's bedroom without permission. But, this morning, Asia felt that something was not right. Listening to her senses, Asia called her mother at work. Asia explained that she heard strange noises coming from their bedroom and that her Dad had not come out of the room yet that morning.

Asia's mother did not understand what was happening. So, Asia took an audio recording of the noises coming from the bedroom and messaged it to her mother. The noises she heard could only be described as moaning and gasping for air.

At this point, Asia's mother directed Asia to have her two younger brothers go into the master bedroom and check on their father. The first problem, however, was that the door was locked. To get into the locked master bedroom, Asia figured out a way to straighten and use a bobby pin as a makeshift key to open the locked door. But, once Asia successfully opened the door, her mother told Asia that she could not go inside the room because their father might not be clothed. Rather, Asia was instructed to have her brothers to go into the room.

Asia's brothers, however, were only 9 and 8 years old. At their Mom's direction, Asia's younger brothers went in to the bedroom to check on their father while Asia remained on the phone with her mother. The brothers returned outside the bedroom door and reported that Dad appeared to be awake, but he was not responding—even when they poked and prodded him and asked him to get up. Their Dad was also continuing to make strange noises.

3

Asia's Mom asked the boys to take Asia's phone back into the room and put the phone next to their Dad. By this time, the boys reported to their Mom and Asia that Dad had a green mucous emerging from his mouth, and he was continuing to moan and gasp for air.

At that moment, every impulse told Asia that she should call 911 and enter the room and begin attempting CPR. Asia suggested that to her Mom, but Asia was instructed not to enter the room and not to call 911. Instead, Asia's Mom informed Asia that Mom would call the church Bishop and ask what to do. A few minutes later, Asia's Mom told Asia that she would come home from work and that the Bishop would meet them at the house. Again, she told Asia not to contact anyone else.

Shortly thereafter, Asia's Mom arrived home followed a short time later by the Bishop. At that point, they finally made the decision to call emergency services and an ambulance came to the home. By that time, however, Asia's father Isaac Billups was pronounced dead at the scene.

This chain of tragic and unexpected events hit Asia especially hard. Asia learned through her own research and consultation with medical professionals that her father's life probably could have been saved if early life saving measures were initiated or if 911 emergency services had been utilized in a timely manner. Asia felt personally responsible for not going against her mother's instructions because she likely could have saved her father.

The Billups family are and were long-time members of the Apostolic Church. While the practices and views of this religious denomination vary, the Billups family followed certain beliefs which affected how they view and handle medical needs. In their view (and their church's view), seeking modern medical care was a sign of infidelity and a lack of faith in God's healing power. As such, their family did not seek professional medical attention or even participate in routine medical

4

checkups like doctor's visits. Similarly, emergency medical situations are left to God's healing power.

After this situation, these religious doctrinal views began to bother Asia and weigh heavily on her. She started internally contemplating questions such as, "why would God allow doctors, hospitals, and emergency services if we are not supposed to use them?" She began engaging in her own internal struggles with the belief system ultimately holding herself responsible for not saving her father, either by entering her parent's room against her mother's instructions or by calling 911.

In the days that followed, the Billups family saw their darkest hours. Their family held a small graveside funeral service in Gloucester and began the process of dealing with the litany of end-of-life decisions and preparations that had to be made. Over the next few weeks, Asia "dealt" with this trauma largely by not dealing with it. Except for certain reminders that her Dad was gone, Asia simply did not process her loss. She went to her job at Chic-Fil-A and she did not talk about her father's death.

In determining the particular sentence to be imposed, 18 U.S.C. § 3553 (a)(l) requires consideration of the "history and characteristics of the defendant."  Asia Billups is currently 19 years of age and is a resident of Gloucester, Virginia.  After her detention hearing on July 24, 2024, Ms. Billups was held without bond.  Asia has since remained on good behavior without any infractions while she has been held at Western Tidewater Regional Jail.

At the time of her arrest and at all times previously, Asia resided in the family home with her parents. Asia was born in Newport News, Virginia on November 15, 2005. Asia's mother Felicia resides in Gloucester, Virginia. Felicia is 42 years old and works at Walmart. Before his death, Isaac Billups also resided in Gloucester, Virginia in the family home.  He was a heavy

equipment operator who, as detailed above, unexpectedly passed away on March 16, 2024 at the age of 41.

Asia has four siblings, Nijaliya, Armani, Isaac and Isaiah. Nijaliya is 21 years old and is a full time college student. Armani is age 18 and works at Chick-fil-a. Armani started her first semester of college in August 2025. Asia other two siblings, her younger brothers, are minors who attend grade school.

Asia has never been married and has no children. She graduated from Gloucester High School in June 2024. While completing high school, Asia was enrolled and completing classes at Rappahannock Community College starting on February 6, 2023, but Asia withdrew on March 18, 2024, following her father's death.

At the time of Ms. Billups' arrest, she was working at Chick-fil-A along with her sister. Asia was raised without exposure to any criminal activity or criminal behavior during her childhood. Asia has a good relationship with all of her siblings, and her absence has greatly affected the lives of her younger siblings. Asia's immediate and extended family have a strong faith-based lifestyle and belief system. Asia's mother continues to love and support her daughter through these hard times.

As noted above, the Billups family has been active and devout members of the Apostolic Church for all of Asia's life. Various members of Asia's family have served in leadership positions within the congregation, and have maintained close ties with the church's Bishop.

It is well recognized in consideration of the sentencing factors under 18 U.S.C. § 3553 that family ties "are pertinent to crafting an appropriate sentence." *United States v. Nellum,* No. 2:04-CR-30, 2005 BL 88941, at *4 (N.D. Ind. Feb. 3, 2005). In determining the particular sentence, §

6

3553(a)(l) requires considering the "history and characteristics of the defendant." Asia shares a close relationship with her parents, her siblings, and her extended family.

Courts have placed great emphasis on a defendant's family ties. *United States v. Myers,* 353 F. Supp. 2d 1026, 1031 (S.D. Iowa 2005) (imposing non-Guidelines sentence where defendant had "been a steadfast and guiding presence in his family's life"). *See, e.g., United States v. Schroeder,* 536 F.3d 746 (7th Cir. 2008) (remanding for resentencing where the sentencing court did not address defendant's claim of extraordinary family circumstances: "[w]hen a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his family members"). *See also Benkahla,* 501 F. Supp. 2d. at 760 (awarding downward variance based on, among other things, defendant's "strong, positive relationships with friends, family and the community."); *United States v. Harding*, No. 05 CR 1285-02, 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006) (awarding a below Guidelines sentencing taking "note of the significant network" ready to support the defendant).

Asia's family is deeply involved in efforts to provide her support while she is incarcerated, and that support will continue in full force until she can come home. The steadfast and guiding presence of her family is a proper consideration in imposing a below-Guidelines sentence. *See United States v. Myers*, 353 F, Supp. 2d. 1026, 1031 (S.D. Iowa 2005).

Asia comes before the Court as a young adult with no criminal history. She has no prior arrests, criminal charges, or juvenile adjudications.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

Throughout her childhood, Asia lived an extremely sheltered life. As an 18-year-old high school senior, Asia only recently acquired a cellular phone, social media, and internet access. It

was in this disturbed mental and emotional state right after his father's sudden death, that Asia looked for distractions and whatever sense of companionship and affection that she could find. With her recently obtained social media access, Asia began engaging in online conversations. These conversations sometimes turned sexual and involved sending explicit photos and having explicit conversations. At that time in her life, they gave Asia a distraction and a sense that she was desired.

After only a few weeks had passed after Asia's father's death, Asia connected with the co-defendant in this case, a man who went by "Mike." Asia met Mike online and Asia believed he was a 23 years old male. Unlike Asia's sheltered and unexposed childhood, online people like Mike initiated conversations with Asia about "grown-up" and "out there" stuff.[1] These conversations offered Asia a distraction and a means to avoid dealing with her trauma.

Within a few weeks of sporadic online messaging conversations with "Mike," the conversations started discussing pornography and thereafter, child pornography. Mike eventually named Asia "Babygirl" and requested that Asia call him "Daddy." Mike eventually directed the conversations with Asia towards whether Asia had access to any minors and directed her to send him pictures. At first, Asia made excuses and would tell Mike that the files would not send. But, Mike would further pressure Asia, telling her things such as, "Daddy is going to be upset if you cant get it to work," and "Daddy won't give you his cock for a week if you cant figure out what's wrong."[2] Ultimately, Mike instructed Asia to make explicit videos and send them to him, which regretfully Asia agreed and did.[3] For a period of approximately 2 months, Mike and Asia engaged

---

[1] Quotations from Asia's FBI Interview.
[2] Defense Exhibit 1, Messages Between Billups and Co-Defendant, Bates 335-343
[3] Defense Exhibit 2, Messages Between Billups and Co-Defendant, Bates 363-365

in sexually explicit conversations over Whats App, a time period in which Asia was longing for acceptance and companionship in the wrong way.

The nature and circumstances of Asia's offense conduct, while extremely serious, are not the same circumstances as many similarly-situated defendants facing the same offenses at sentencing. Every single production of child pornography case includes egregious facts—those facts which constitute the factual basis for the charged offenses. But, the specific nature and circumstances of Asia's offenses are less serious than many production offenses which come before the Court.

The investigation into this matter began because of a National Center for Missing and Exploited Children ("NCMEC") Cybertip because of suspected digital images and text conversations by the Co-Defendant Machonis and a then-unidentified individual. These triggering Cybertips involved the suspected enticement of a minor for sexual purposes via Snapchat. Co-defendant Machonis eventually led to identification of Asia and the determination that digital images of minors engaged in sexually explicit conduct had been created and transmitted from Asia to Machonis.

Ms. Billups made no attempts to obstruct the investigation, received her *Miranda* rights and made statements against her interest. She remained cooperative during the interview and investigation. She has also agreed to full cooperation with the U.S. Attorney's Office.

The forensic examination of Asia's phone revealed that it contained only four videos depicting sexually explicit conduct, as charged in the indictment. In many federal and state child pornography cases, courts are routinely tasked with sentencing individuals who have file counts reaching into the hundreds, and often thousands of files.

## THE SENTENCING COMMISSION AND CHILD PORNOGRAPHY GUIDELINES

In determining an appropriate sentence, the Court must "consider all of the 18 U.S.C § 3553(a) factors," "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id*. at 1242-43. An inherent aspect of the applicable sentencing law is the authority of the Court to disagree with the Guidelines. Because "the Guidelines are now advisory…as a general matter, courts may vary based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02.

As the Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a District Court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary" to achieve 18 U.S.C. § 3553(a)'s purposes." *Id*. at 109-10.

## ARGUMENT IN SUPPORT OF VARIANCE

The sentencing factors which the Court must consider are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) need for the sentence to (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kind of sentences available; (4) the sentencing range established for the type of offense committed by the defendant as set forth in the United

Stated Sentencing Guidelines; (5) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution to any victims of the offense.

### A.    *Sentencing Considerations Should be Case Specific*

Fashioning a just sentence cannot be reduced to mere arithmetic. Reliance solely on numbers, quantities, offense levels, criminal history categories and matrixes produces an illusory precision that obscures the fact that sentencing, in the end, must involve the exercise of judgement, i.e. a judge's discerning opinion that results from identifying and weighing fairly all of the factors relevant to achieving the statutory sentencing goals. *See United States v. Biheiri*, 356 F. Supp. 2d 589 (E.D. VA 2005).

The facts and circumstances of this offense are distinguishable from many similarly-charged defendants. To begin, there was an extremely limited number of videos produced.  Four videos were produced in this case, as compared to hundreds of images and videos produced in other cases by defendants facing the same charge.  There was also very limited distribution in this case. Only one transaction, to one person, where the only files what were distributed were the ones created. And, perhaps most important, all of the offenses were done at the behest of an older adult individual who either knowingly or unknowingly found Asia in an emotionally compromised state shortly after her father's death.

These facts do not undermine Asia's appreciation for the severity of her own actions, including the damage that these actions had on her family who, like her, were already hurting from the loss of her father.

B.       *The Court Can Validly Consider Collateral Consequences of the Conviction*

Asia is fully aware of the fact that regardless of the exact term of incarceration imposed, she faces a mandatory minimum of fifteen years in prison, a lifetime of registration as a sex offender, and a lifetime of having three federal felony convictions. It is with a deep conscious that she realizes the impact that sexual offender registration will have upon her even upon her release. She will have to deal with the consequences of her conduct for the rest of her life. Courts have recognized the serious collateral consequences inherent with a conviction of this nature and have varied downward on this basis. *See e.g. United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007).

C.       *Deterrence As a Consideration*

Specific deterrence is a sentencing factor under 18 U.S.C. § 3553 (a)(2)(C). The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects…Three National Academy of Science panels reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between

probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year timeframe").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level…While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. From these references the Court can conclude that an artificially long term of incarceration is not necessary to achieve deterrence.

### D.    *Protection of the Public*

18 U.S.C. § 3553(a)(2)(C) mandates that the need to protect the public from further crimes of the defendant must be considered in fashioning an appropriate sentence. This factor includes providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

It is counsel's hope that, at some point, Ms. Billups will have served her sentence and will be released from prison. The key to eliminating or reducing any risk to the public is the treatment that Asia will receive while incarcerated and/or upon release while she is being

13

closely supervised.  The goal of this sentencing purpose is to protect the public indefinitely, not to simply keep them safe until a defendant is released.

It is a forgone conclusion that Ms. Billups will mandatorily serve a lengthy prison sentence at the time in her life in which she is barely an adult. As only a 19-year-old, she has not fully developed her identity as a person and member of society. Asia has yet to even live on her own outside of her parent's home.

Asia's circumstances make her moldable, trainable, and more capable of accepting rehabilitation than most. By the time of her release from incarceration and ultimate removal from supervised release she would present no danger to the public.

E.       *Uniformity in Sentencing*

In October 2021, the United States Sentencing Commission released a report focusing on sentencing statistics from child pornography production cases from fiscal year 2019: *Federal Sentencing of Child Pornography: Production Offenses* ("the Report").  The Report notes that, while production offenders generally received lengthy prison sentences, a majority of child pornography production offenders received a variance below the applicable guideline range (57.2% of the 512 cases).  Referencing the sentencing characteristics (enhancements), the Report notes that 90.8% of production offenders in FY 2019 received an enhancement for the age of the victim, and 71.7% received an enhancement for a sexual act or sexual contact – both representing the vast majority of offenders. The characteristics of the underlying offenses create an artificially high suggested Guidelines sentence for someone like Asia, and is likely why more than half of production cases statistically receive a below guidelines sentence. If anything, Asia's personal circumstances support a below guidelines sentence.

14

*F.*     *Special Assessments*

The Court must consider special assessments pursuant to 18 U.S.C. §§ 3014 and 2259A(a)(1).  In determining whether a defendant is indigent, courts "consider, among other things, the income, financial resources, and earning capacity of the defendant, as well as the burden that the [financial penalty] will impose upon the defendant and his dependents." *United States v. Lail*, 736 Fed. App'x 381, 382 (4th Cir. 2018) (per curiam) (quoting *United States v. Aramony*, 166 F.3d 655, 665 (4th Cir. 1999)); *see also United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017) ("[I]n the context of § 3014 indigency determinations, an analysis of both a defendant's current financial situation and his ability to pay in the future is appropriate in determining his 'non-indigent' status.").

The factors under § 3572, considered in determining the amount of assessments, include, among other things, the defendant's income, *earning capacity*, and financial resources, the burden that the fine will impose upon the defendant and any dependent, whether restitution is ordered or made and the amount of such restitution, and the expected costs to the government of any imprisonment or term of supervised release. 18 U.S.C. § 3572 (emphasis added).

Counsel respectfully requests that the Court consider Asia's future earning ability and her ability to pay in the future.  Asia has limited schooling and no specialized training.  Upon her release, she will have to begin a career, one which undoubtedly will be lower-paying than any which would have been available to her prior to her convictions.

### SUMMATION

The Defendant Asia Billups is before this Honorable Court for determination as to an appropriate sentence. While the Defense is cognizant of the currently applicable sentencing

guideline suggested sentence of 960 months, it is respectfully submitted that based upon the Asia's history and characteristics, as well as all factors in 18 U.S.C. § 3553(a), an appropriate sentence is a concurrent imprisonment for one hundred eighty (180) months, followed by five (5) years of supervised release. This proposed sentence is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).

Attached to this position paper are exhibits and documents that the Defendant respectfully requests be reviewed by the Honorable Court. They are as follows:

**Defense Exhibit 1:** Messages between Billups and Co-Defendant, Bates 335-343

**Defense Exhibit 2:** Messages between Billups and Co-Defendant, Bates 363-365

A. **High School Diploma**

B. **Photographs**

C. **Character Letters**
   1. Lisa Musgrove
   2. Rocky Elliot Kimpel
   3. Dr. JoAnn Haysbert
   4. Takysha Livingston
   5. Ernesha Strazdins
   6. Lareta Newton-Rayford
   7. Tierra Samuels
   8. Glenesha Bridgett
   9. Faith Collier
   10. Cheryl Lennon
   11. Charmaine Douglas
   12. Tamar Bridgett
   13. Nijaliya Billups
   14. Armani Billups
   15. Felicia Billups

D. **Personal Statement from the Defendant, Asia Billups**

**ASIA TAMARA BILLUPS**


By _____/s/_____
         Defense Counsel



_____/s/_____
Robert W. Canoy, Esq.
Virginia State Bar No. 98956
Attorney for Asia Tamara Billups
McCormack & McCormack
Attorneys at Law
641 Lynnhaven Parkway, Suite 201
Virginia Beach, Virginia 23452
Phone:  757-463-7224
Fax:  757-463-5171
rcanoy@mccormackpc.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of September, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Peter G. Osyf, Esquire
Assistant United States Attorney
721 Lakefront Commons
Suite 300
Newport News, Virginia 23606
Phone: 757-591-4000


_____/s/_____
Robert W. Canoy, Esq.
Virginia State Bar No. 98956
Attorney for Asia Tamara Billups
McCormack & McCormack
Attorneys at Law
641 Lynnhaven Parkway, Suite 201
Virginia Beach, Virginia 23452

17

Phone:  757-463-7224
Fax:  757-463-5171
rcanoy@mccormackpc.com


I further certify that on this 12TH day of September, 2025, I caused a true and correct copy of the foregoing Position of the Defendant with Respect to Sentencing Factors to be e-mailed to the following:

Nicole Pender
United States Probation Officer
600 Granby Street
Suite 200
Norfolk, Virginia 23510
Phone: 757-222-7308
Nicole_pender@vaep.uscourts.gov


_____/s/_____
Robert W. Canoy, Esq.
Virginia State Bar No. 98956
Attorney for Asia Tamara Billups
McCormack & McCormack
Attorneys at Law
641 Lynnhaven Parkway, Suite 201
Virginia Beach, Virginia 23452
Phone:  757-463-7224
Fax:  757-463-5171
rcanoy@mccormackpc.com

18